# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1552
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff – Appellee, | * |
| | * |
| v. | * |
| | * |
| Robert Beale, | * |
| | * |
| Defendant – Appellant. | * |

_____

No. 09-1556   *   Appeals from the United States
_____   *   District Court for the
              *   District of Minnesota.

United States of America,

    Plaintiff – Appellee,

v.

John Howard Pelton,

    Defendant – Appellant.

|  |  |
|---|---|
| _____ | \* |
|  | \* |
| No. 09-1558 | \* |
| _____ | \* |
|  | \* |
| United States of America, | \* |
|  | \* |
| Plaintiff – Appellee, | \* |
|  | \* |
| v. | \* |
|  | \* |
| Frederick Ogan Bond, | \* |
|  | \* |
| Defendant – Appellant. | \* |

_____

Submitted: December 14, 2009
Filed: September 2, 2010

_____

Before BYE, BEAM, and COLLOTON, Circuit Judges.

_____

BYE, Circuit Judge.

Robert Beale, John Pelton, and Frederick Bond were convicted of conspiracy to prevent by intimidation a judicial officer from discharging her official duties, in violation of 18 U.S.C. § 372, and obstruction of justice, in violation of 18 U.S.C. § 1503(a). On appeal, Beale, Pelton, and Bond argue the district court[1] erred in denying their motions for judgment of acquittal on both counts, claiming the evidence was insufficient to sustain the convictions. They further argue the convictions cannot stand because their actions amounted to a peaceful protest protected under the First

---

[1]The Honorable Rodney S. Webb, now deceased, United States District Judge for the District of North Dakota.

Amendment. In addition, Beale argues the district court erred in 1) denying his motion for new trial based on the denial of a requested jury instruction, 2) failing to obtain a knowing waiver of his right to counsel, and 3) imposing an unreasonable consecutive sentence. Bond contends the district court erred in denying his motion for new trial based on the government's failure to call Judge Ann Montgomery as a witness, in violation of his Sixth Amendment right to confront his accuser. We affirm.

I

In August 2006, Beale was scheduled to appear at trial before U.S. District Court Judge Ann D. Montgomery in the District of Minnesota. Beale did not appear; he was arrested in November 2007, and returned to Minnesota. A new trial date, with Judge Montgomery presiding, was set for April 21, 2008.

Pending his trial, Beale was held at the Sherburne County Jail. Inmates at Sherburne County jail have access to phones and are able to make calls to individuals outside of the facility. With the exception of calls to attorneys, all phone calls made by inmates are recorded, though not necessarily monitored. In February 2008, the U.S. Marshals Service requested recordings of phone calls made by Beale from the jail. From the end of February 2008 through April 2008, Sherburne County Investigator Mike Sieg monitored all of Beale's phone calls.

Throughout March 2008 and April 2008, Judge Montgomery and the U.S. District Court in Minnesota received a variety of documents relating to Beale and his pending trial, including documents from "Our one supreme court common-Law court for the de-jure Ramsey: the county: Minnesota: the land a superior court for the People, original jurisdiction under Almighty Yahweh exclusive superior jurisdiction in and for confederation-government United States of America" ("common-law court"). Documents from the common-law court included, among others, an Order

to Dismiss, the Great Writ of Habeas Corpus, Contempt of Court, and a document entitled "Warrant for Arrest, Of the Bond for Ann D. Montgomery."

In addition to documents from the common-law court, on March 17, 2008, Judge Montgomery received notice of a lien filed with the Minnesota Secretary of State, and recorded in Brown County, Minnesota. Included with the lien documents was a cover page titled, "Due Presentment Under Notary Seal." The cover page stated "[d]ue presentment is hereby made of: Notice of lien against the bond of Judge Ann Montgomery." Robert Bonine Beale was listed as the party to whom the acknowledgment of the lien should be sent. The lien referenced Beale's criminal case scheduled for trial in front of Judge Montgomery on April 21, 2008. The documents attached to the lien included a confession judgment, signed by Beale.

Additionally, on March 27, 2008, a purported U.S. District Court criminal subpoena and a purported State of Minnesota subpoena, ordering Judge Montgomery to appear on April 3, 2008, at a location in Little Canada, Minnesota, were received by the U.S. District Courthouse in Minnesota. Each subpoena listed Beale's name and his federal criminal case number on the face of the subpoena.

On March 29, 2008, after Supervisory U.S. Marshals Deputy Steve Swenson finished reviewing documents sent to Judge Montgomery, the U.S. Marshals Service opened a protective investigation. The Federal Bureau of investigation was also notified of the Marshals' investigation. Among other steps, the Marshals sought to determine whether Beale was in contact with anyone outside of jail who could assist him. Upon reviewing the jail's phone records, the Marshals determined Beale was in contact with several people, including his "common-law wife" Mun Suk Kim.

A joint investigation between the Marshals and FBI determined Beale recruited Angel Gessner and Norman Pool in February 2008, to work for him. Gessner agreed to do clerical work, including processing paperwork, and Pool agreed to similar work

but on a more limited basis. Beale put Gessner in contact with others who could assist her, including Bond, Pelton, and Pool, all of whom communicated with one another by phone and email.

On February 22, 2008, John Howard, a/k/a Pelton, signed a subpoena for Beale to appear on March 3, 2008, at a meeting of the Ramsey county common-law court. The subpoena was served along with a series of other documents issued by the common-law court and signed by Pelton, Bond, and Pool. The other documents were sent to, among others, Judge Montgomery and included a "Great Writ of Habeas Corpus," commanding "hereby . . . all named Respondents, jointly and severally, under this binding Writ of Habeas Corpus to produce and disclose the body corpus of Robert-Bonine: for the family Beale[.]" The "Great Writ of Habeas Corpus" was signed by John Howard, Pelton's alias.

Beale, of course, was not released and did not appear at the March 3, 2008, meeting of the common-law court. Instead, Bond appeared for him and represented to other members of the common-law court he had authority to sign documents for Beale. Bond further indicated Beale "[w]as fully expecting to be here. He had a feeling he wouldn't be, but he was planning on being here[.]" Pelton appeared at the meeting as the Chief Justice of the common law court and Pool attended as the Clerk of Court. During the course of the meeting, Pool explained the United States District Court is "prosecuting Robert Bonine Beale falsely for private corporation." He went on to explain Beale was being illegally held in the Sherburne County jail and announced: "So he's been kidnapped."

On March 4, 2008, Gessner filed a lien against the "bond" of Judge Montgomery. The lien was filed with the Minnesota Secretary of State on March 4, 2008, in Brown County, Minnesota, on March 10, 2008. After filing the lien, Gessner mailed a cover letter, the lien, and supporting documents to Judge Montgomery's chambers. Gessner testified she filed the lien at Beale's direction because he wanted

Judge Montgomery to see the lien and the supporting documents and to know of the lien against her bond. Gessner stated she understood Beale desired to have Gessner file the lien because it would make Judge Montgomery unable to perform her duties as a judge and unable to sit on the case pending against Beale. Gessner explained: "Mr. Beale had stated that he wanted to intimidate the judge. And that was the purpose of sending out the liens–a copy of the liens, make her think about it."

On March 24, 2008, Pelton signed additional documents which were sent to Judge Montgomery and the U.S. District Court. Pool explained the documents were forwarded to him by Bond, and were intended "to get the Judge to no longer be–to work in her official position." When asked why the documents were sent to Judge Montgomery, Pool explained: "To intimidate her, to change her mind on Robert Beale's behalf."

On April 10, 2008, Bond brought a subpoena to the Hennepin County Sheriff's Office. The subpoena sought Judge Montgomery's attendance at a location in Little Canada, Minnesota. It was addressed to Ann D. Montgomery and listed her home address as the location for service. Bond told Deputy Sheriff Brad Ericksen he wanted the subpoena served on Judge Montgomery. The document listed "ROBERT B BEALE, ENS LEGIS," as the defendant, and contained Beale's criminal case number. It was also signed by Pelton, among others. Because the Hennepin County Sheriff's office had been alerted that individuals may try to have civil process served on Judge Montgomery, the subpoena was not served.

On April 17, 2008, an uncharged co-conspirator brought an arrest warrant into the Hennepin County Sheriff's Office. The warrant was titled "Warrant for Arrest Failure to Appear." The warrant listed Judge Montgomery's full name and her home address as the location for service, and was signed by Pelton and Bond. Accompanying the arrest warrant, among other things, was a copy of the subpoena, previously provided to Sergeant Ericksen of the Hennepin County Sheriff's Office.

The uncharged coconspirator asked Deputy Sheriff Daniel Antisdel questions about how long it would take the Sheriff's Office to arrest Judge Montgomery.

Throughout the course of the conspiracy, both prior to the March 3, 2008, meeting of the common-law court and until the defendants were arrested on April 19, 2008, the charged and uncharged co-conspirators remained in contact with one another through emails. For example, on March 15, 2008, Gessner wrote to Pool explaining she was working on "the 2nd Contempt Order." Additionally, she asked Pool for "a copy of Bob's signature[.]" On March 16, 2008, Pool and Bond responded to Gessner in separate emails offering assistance. On March 17, 2008, Gessner sent Pool an email with common-law court documents attached, seeking his assistance to update the documents. She told Pool "Fred (identified through Gessner's testimony as Bond) would like for you to bring the updated stuff with you to the meeting." Gessner explained she relayed this information to Pool at Bond's direction.

On March 23, 2008, Bond and Gessner discussed via email a subpoena to be directed to Judge Montgomery. In the email, Bond asked Gessner to talk to Beale, and "[a]x (sic) him about the subpoenas if Ann is the only one that gets it." On April 2, 2008, Bond sent Gessner an email with a file entitled "Criminal Complaint.doc" attached. Also attached were documents charging Judge Montgomery with a variety of violations of federal law. Later on April 2, 2008, in preparation for a meeting of the common-law court scheduled for April 3, 2008, Bond sent an email entitled "tomorrows showdown" (sic) to Pelton, with Gessner carbon-copied on the email. In the email, Bond discussed individuals attending the meeting, and the criminal complaint against Judge Montgomery.

On April 3, 2008, Bond sent Gessner an email with an attachment entitled "Warrant for Arrest - Ann Home Address.doc." Attached to the email was an unsigned warrant for the arrest of Judge Montgomery, listing her home address on the document. This draft document appeared to be an unfinished version of the arrest

warrant ultimately served on the Hennepin County Sheriff's Office on April 17, 2008. On April 8, 2008, Gessner sent an email to Bond titled, "I went over it with him and this is final." Attached were copies of multiple documents, including one entitled "Warrant for Arrest Failure to Appear" and listed Judge Ann Montgomery as the subject of the arrest warrant with her home address provided. The email was sent from Gessner to Bond because he was going to present the arrest warrant for Judge Montgomery. Bond and Beale both told Gessner Bond was going to present the warrant for arrest to Judge Montgomery. Bond and Gessner discussed serving the subpoena and arrest warrant on Judge Montgomery but Bond told her he did not feel comfortable serving those documents. Eventually, Mark Fedor delivered the arrest warrant for Judge Montgomery to the Hennepin County Sheriff's Office. Fedor's name is listed on multiple common-law court documents as a notary and as a justice.

On April 9, 2008, Gessner responded to an email sent by Bond titled "please send me the latest Warrant for Arrest that you sent me last night." Gessner's response contained a document entitled "Warrant for Arrest Failure to Appear."

During the course of the conspiracy, Beale and various co-conspirators coordinated their activities through a series of phone calls. In a phone call on April 3, 2008, Beale discussed with Kim his plans for April 21, 2008. Beale told Kim: "Honey, if, if my plans work out on April 21st . . . it will be a tremendous blessing, tremendous blessing." Beale further stated: "[God] wanted me to destroy the Judge. He wanted to. He wanted 'cause that Judge is evil and wanted me to get rid of her." Later the same day, Beale called Pelton and discussed the meeting scheduled for later that day. While discussing their plans for the meeting and their issues with the government, Pelton told Beale: "What we have to do is have teeth to bite 'em with." Later in the conversation, after continuing to discuss the illegitimacy of the government and courts, Beale told Pelton: "We just wanna arrest 'em for going outside their jurisdiction and kidnapping people." Pelton agreed, and then responded,

"it's gonna take some. It's gonna take some doing to do that because you're, you're fighting the system."

Later on April 3, 2008, Beale called Kim again. During the call, Beale further explained the purpose for the meeting scheduled that evening. Beale told Kim "the Judge" was subpoenaed to attend the meeting, "[b]ut if she doesn't show up then they're gonna issue a warrant for her arrest." Later, Beale stated: "God has got me here. He wants me to take the Judge out. That's what he wants me to do."

On the evening of April 3, 2008, Beale called Pelton who informed him Judge Montgomery did not show up at the meeting. Beale and Pelton then discussed how to serve the arrest warrant on Judge Montgomery. Pelton told Beale he would meet with "Fred" the next morning, and the pair discussed who would draw up the warrant. Finally, Pelton and Beale discussed an upcoming meeting of the common-law court on April 16, and Beale's trial scheduled for April 21, 2008. Pelton assured Beale "there's gonna be a lot of us there," and "I told Fred, I said, we should have at least, you know, 30 or 40 people in the court that day." Beale responded: "That should be wonderful and everybody should have a, a, an arrest warrant in their hand so that, ah, 'cause, you know, if I issue an order for arrest. And if they don't, ah, comply with it then I can say look, you know, we can make a citizen's arrest here and everybody can raise their hand, raise their paper in their hands." After a short back and forth with Pelton, Beale further stated: "And, and I'm gonna hold her in contempt. And issue a warrant for her bond. And then I'm gonna tell . . . the Bailiff to kick her out of the room. And if he doesn't do it then I'm gonna say look it if you don't obey. If you don't, if you don't obey my orders then we're gonna. You know we're all here gonna arrest you."

Shortly after the phone call between Beale and Pelton, Beale called Gessner to discuss the common-law court meeting and Judge Montgomery's failure to appear. Beale told Gessner to find Judge Montgomery's home address and explained various

internet-based services used to locate an individual's home address. Gessner found Judge Montgomery's home address and provided it both to Bond and Beale. When Gessner provided Beale with Judge Montgomery's home address, Beale told her: "Well that's gonna be a big help 'cause now we can serve her at home instead of in the office. She has too much protection around her." Beale then called Pelton and gave him Judge Montgomery's home address, stating: "So now we can send the Sheriff to her house and we can also send service to her house in the future which would be a lot easier."

During a phone call on April 16, 2008, Gessner and Beale discussed a recent common-law meeting and plans for the future. Gessner informed Beale that Bond told her Judge Montgomery did not show up before the common law court grand jury. Gessner explained "[Bond] said he's gonna take that warrant . . . um . . . to the Sheriff today though." Later, Beale and Bond discussed the arrest warrant and the grand jury meeting the night before. Beale told Bond, "First of all . . . the arrest warrant's much more important . . . than the Grand Jury. What I'd like you to do is . . . call the sheriff and ask him if he served it. And then go down there, and give him the warrant. At least it's gotta be somethin' . . . somethin' that, ah . . . re– . . . well, the return of service on that is to bring the body." Bond asked for clarification and Beale responded: "[T]o bring the body, I said!" After further discussions concerning service of the arrest warrant, Beale stated: "But it's important that she sees [the warrant]. That's what I want her to do is see it. I want her to be intimidated. I hope she saw . . . the subpoena. Now I want her to see the warrant." Towards the end of the phone call, after Beale thanks Bond for his efforts, Bond tells Beale, "I think there's a lotta people pullin' for ya, but I'm . . . probably . . . heaviest, I guess."

On April 19, 2008, Pelton, Bond, Gessner and Pool were arrested pursuant to arrest warrants and a complaint in federal court alleging violations of 18 U.S.C. § 372. On April 24, 2008, Pelton's vehicle was searched pursuant to a federal search warrant. Officers recovered a variety of documents tied to the conspiracy.

Beale, Pelton, and Bond were indicted and ultimately convicted as charged following three separate jury trials of conspiracy to prevent an official by force, intimidation or threat from discharging her duties, in violation of 18 U.S.C. § 372, and obstruction of the due administration of justice, in violation of 18 U.S.C. § 1503(a). On December 12, 2007, Beale waived his rights to counsel and elected to proceed pro se pursuant to Faretta v. California, 422 U.S. 806 (1975). At a pretrial hearing, the district court found that Beale knowingly, voluntarily, unequivocally, and intelligently waived his right to counsel.[2] During trial, all three defendants made motions for judgment of acquittal; all were denied. During trial, Beale proposed a jury instruction explaining the concept of freedom of religious belief.[3] The district court declined to

---

[2]During the hearing, counsel for Beale stated as follows:

Your honor, Mr. Beale is aware from my past representation of my advice that it's a bad idea to represent one's self. In addition to that, he has given a [Faretta] waiver in this district previously on the record and has been advised, I believe, in some detail, that it's not a good idea to represent one's self. That even lawyers, when they're charged, hire lawyers. I believe that the Judge may have likened it to attempting to do surgery on one's self. And at the same time, Mr. Beale understands that he has both a Sixth Amendment right to be represented here, and that the Court will appoint counsel for him. But he also understand[s] that under that same Sixth Amendment right under [Faretta] v. California, he has the right of self-representation.

After the district court inquired if Beale's waiver of counsel was knowing and voluntary Beale responded "Your honor, I waive all rights, benefits, and privileges of the United States."

[3]The proposed instruction was as follows:

You are further instructed that the Constitution of the United States guarantees freedom of religion and religious expression. A defendant's religious beliefs, thoughts, and manner of worship alone cannot be held against a defendant. Men are allowed to believe that

issue the instruction. Relevant to this appeal, Beale was sentenced to 48 months' imprisonment.

Beale, Pelton, and Bond timely appealed.

II

Beale, Pelton, and Bond argue the evidence presented was legally insufficient to convict them of the crimes charged.

"We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor,

---

which they cannot prove.

> A defendant's religious beliefs, thoughts, and manner of worship alone are not justification for an overt criminal act. But, if the religious views espoused by the defendants in some of the documents and discussion in evidence in this case might seem incredible, if not preposterous, to most people those may not be held against any defendant during your deliberations. The First Amendment does not select any one group or any one type of religion for preferred treatment and it stands squarely against allowing any possibility that a prosecution for alleged criminal activity might degenerate into religious persecution.
>
> Religious liberty includes, as it must, the right to communicate religious experiences to others, and you must not attempt the task of judging the legitimacy of varied religious beliefs or experiences. Such beliefs could never be verified to the minds of those whose field of consciousness does not include the same religious insight. I therefore instruct you that the law withholds from your consideration any question of the truth of any religious doctrine mentioned in this case or any question about whether any defendant sincerely believed the religious claims he may have made in connection with this case.

and accepting all reasonable inferences that support the verdict." United States v. Van, 543 F.3d 963, 964 (8th Cir. 2008).

A

The conspiracy charge requires proof that each defendant "conspire[d] to prevent by force, intimidation or threat . . . [to] impede [any officer of the United States] in the discharge of [her] official duties." 18 U.S.C. § 372. Thus, in order to sustain a conviction, the government must submit sufficient evidence to prove that (1) a conspiracy existed, (2) the appellants voluntarily entered into the conspiracy, and (3) the members of the conspiracy conspired to prevent by force, intimidation or threat, an officer of the United States from discharging her duties.

The government's proof of the existence of a conspiracy which was joined by Beale, Pelton, and Bond is overwhelming. Without repeating all the evidence at length here, each appellant sent or received multiple emails or phone calls detailing plans to arrest Judge Montgomery as well as other court officers. Further, the evidence is sufficient to show Beale, Pelton, and Bond intended, by intimidation or threat, to prevent Judge Montgomery from presiding over Beale's trial. In the case of Beale, there was direct testimony that he intended to intimidate Judge Montgomery. With respect to Pelton, he forwarded documents to Pool, documents which Pool later explained were created "[t]o intimidate [Judge Montgomery], to change her mind on Robert Beale's behalf." Bond signed the arrest warrant for Judge Montgomery, and also delivered a summons for Judge Montgomery to the Hennepin County Sheriff's Office. Pelton and Beale planned to gather thirty to forty people to make the arrest. We conclude the evidence was sufficient to convict Beale, Pelton, and Bond of conspiracy to prevent by force, intimidation or threat, an officer of the United States from discharging her duties.

Appellate Case: 09-1552   Page: 14   Date Filed: 09/02/2010 Entry ID: 3699921
CASE 0:08-cr-00210-LLP-JJK   Doc. 232   Filed 09/02/10   Page 14 of 19

B

In order to be convicted of obstruction of justice, the government was required to prove beyond a reasonable doubt that each appellant did

> corruptly, or by threats or force, or by any threatening letter or communication, endeavor[] to influence, intimidate, or impede any . . . officer in or of any court of the United States, . . . or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede the due administration of justice.

18 U.S.C. § 1503(a). In order to convict for obstruction of justice, the government must show that each defendant intended to "interfer[e] with the due administration of justice." United States v. Russell, 234 F.3d 404, 407 (8th Cir. 2000) (quoting United States v. Aguilar, 515 U.S. 593, 599 (1995)). A conviction under 1503(a) requires proof of a sufficient nexus between each defendant's actions and an intent to impede judicial proceedings. Russell, 234 F.3d at 407 (8th Cir. 2000) (citing Aguilar 515 U.S. at 599). "According to the 'nexus' analysis, 'the act must have a relationship in time, causation, or logic with the judicial proceedings.'" United States v. Joiner, 418 F.3d 863, 868 (8th Cir. 2005).

The evidence to support Beale, Bond, and Pelton's convictions for obstructing justice overlaps significantly with the evidence supporting each appellant's conviction on count 1. Each coconspirator was involved in the creation, filing or distribution of the arrest warrant provided to law enforcement and the distribution of arrest warrants to members of the common law court. The phone calls and emails between the coconspirators and Gessner's testimony make clear that the creation and refinement of the arrest warrant ultimately served on the Hennepin County Sheriff's office was a joint effort, designed to stop the trial against Beale and remove Judge Montgomery from Beale's trial. Additionally, the arrest warrant (and the subpoena that

-14-

accompanied the arrest warrant) was signed by both Bond and Pelton, who planned to gather as many as forty people to arrest Judge Montgomery. This evidence is sufficient for a reasonable jury to convict Beale, Bond, and Pelton of obstruction of justice.

### III

Beale, Pelton, and Bond next argue their convictions unlawfully abridge their freedom of speech protected by the First Amendment. Our review of the First Amendment issue is de novo. Planned Parenthood v. Dempsey, 167 F.3d 458, 461 (8th Cir. 1999).

The First Amendment does not protect a true threat, "a statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another." Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 624 (8th Cir. 2002) (en banc).

At Beale, Pelton, and Bond's request, the district court instructed the jury as follows:

> [F]ree expression is not an unlimited right. Violence or imminent threats of violence are not protected by the Constitution. Expression becomes unlawful if it presents a clear and present danger to the government or people within the government. It is your responsibility as jurors to make a distinction between constitutionally protected speech and criminal threats. If you find that the defendant was engaged in protected free expression, then the government has the burden of proving beyond a reasonable doubt that the defendant engaged in behavior which presented a clear and present danger to the government or people within the government.

After a review of the record, we conclude there is sufficient evidence of a serious expression on the part of Beale, Pelton, and Bond of an intent to harm or cause injury to another. In a phone call, Beale stated: "[God] wanted me to destroy the Judge. He wanted to. He wanted 'cause that Judge is evil and wanted me to get rid of her." Further, all three appellants, as previously discussed, conspired to falsely arrest–in other words, kidnap–Judge Montgomery. Such a crime, if committed, causes harm or injury to the victim. See 18 U.S.C. §§ 1114, 1201(a) (authorizing punishment of up to life in prison for kidnaping "any officer or employee of the United States . . . while such officer or employee is engaged in . . . the performance of official duties"). Therefore, we conclude the First Amendment does not bar Beale, Pelton, or Bond's convictions because the conduct underlying the convictions was an unprotected true threat.

IV

Next, Beale argues the district court erred by denying his motion for new trial based on the denial of a requested jury instruction. The rejection of a proposed instruction is reviewed for abuse of discretion. United States v. Meads, 479 F.3d 598, 601 (8th Cir. 2007) (citing United States v. Gladney, 474 F.3d 1027, 1032 (8th Cir. 2007)).

A defendant is entitled to a theory of defense instruction if it is timely requested, it is supported by the evidence, and correctly states the law. Id. (citing United States v. Claxton, 276 F.3d 420, 423 (8th Cir. 2002)). A defendant is not, however, entitled to a particularly worded instruction. Id. "'The district court has broad discretion in formulating the jury instructions.'" Id. (quoting United States v. Johnson, 278 F.3d 749, 751 (8th Cir. 2002)).

We find no abuse of discretion here. During Beale's case, the jury was never instructed to pass judgment on any of Beale's religious beliefs. The district court

correctly advised the jury of the elements of the offenses in Counts 1 and 2, and correctly advised the jury of the burden of proof, as well as Beale's theory of his defense. The jury was also advised more than once about the protections afforded by the First Amendment. In sum, Beale's religious beliefs were never placed at issue at trial; the district court therefore did not abuse its discretion in declining to issue the instruction.

V

Beale contends the district court erred when it determined Beale knowingly and intelligently waived his right to counsel. We review de novo the district court's decision to allow the defendant to waive his right to counsel. United States v. Mahasin, 442 F.3d 687, 691 (8th Cir. 2006).

We conclude Beale's waiver was knowing and voluntary. Beale was extensively advised of his right to counsel and then knowingly and voluntarily waived that right on the record in open court. At the pretrial hearing, counsel advised the district court that Beale had already been fully advised of his rights, understood his rights and wished to waive them. Under these circumstances, the district court did not err when it concluded Beale's waiver was knowing and voluntary.

VI

In his last point, Beale argues the district court procedurally erred by not adequately explaining its reasons for its sentence, in violation of 18 U.S.C. § 3553(a).

After determining the appropriate guideline range in a case, a district court must consider the factors listed in 18 U.S.C. § 3553(a). United States v. Roberson, 517 F.3d 990, 994 (8th Cir. 2008) (citation omitted). Further, at sentencing, the court must "state in open court the reasons for its imposition of the particular sentence." 18

U.S.C. § 3553(c).  This does not require the district court to "issue a full opinion in every case, but 'it should set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decision making authority.'" Roberson, 517 F.3d at 994 (quoting Rita v. United States, 551 U.S. 338, 339 (2007)) (alteration in original).

We have reviewed the sentencing transcript and find Beale's argument to be without merit.  Beale did not object to the calculation of the relevant sentencing range, and the district court considered all of Beale's arguments.  We therefore conclude the district court did not procedurally err by failing to consider the relevant § 3553(a) factors at sentencing.

## VII

Finally, Bond argues that his Sixth Amendment rights were violated when the government did not call Judge Montgomery as a witness at trial.

The Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  Thus, "[a] witnesses's testimony against a defendant is inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." Melendez-Diaz v. Massachusetts, 129 S.Ct. 2527, 2531 (2009) (internal citations omitted).

The Sixth Amendment's right to confront witness does not include a mandate requiring the government to call particular witnesses.  For example, we have held:

> Absent unusual circumstances such as knowingly concealing evidence favorable to a defendant, the Government has a wide discretion with

> respect to the witnesses to be called to prove its case. The government is not ordinarily compelled to call all witnesses competent to testify including special agents or informers.

United States v. Mosby, 422 F.2d 72, 74 (8th Cir. 1970) (citations omitted).

The government's failure to call Judge Montgomery as a witness for the prosecution did not implicate Bond's confrontation right.

## VIII

Affirmed.

_____